## In re INVESTIGATION of REDUCTION in SERVICES of FLORIDA EAST COAST RAILWAY CO.
### No. 6923-RR.

Florida Public Utilities Commission.
April 4 and July 31, 1963.

Lewis W. Petteway, Commission General Counsel, for the commission and for the public generally.

Chairman EDWIN L. MASON, Commissioners JERRY W. CARTER and WILBUR C. KING participated in the disposition of this matter.

BY THE COMMISSION.

*Order, April 4, 1963:* *Whereas,* It is common knowledge that during the past several weeks there has been a reduction in regular freight and passenger services rendered to the shipping and traveling public by the Florida East Coast Railway Company; and

*Whereas,* It is also common knowledge that the management of said railroad and its employees are involved in some controversy resulting in a strike which has affected the regular services offered by said railroad to the shipping and traveling public; and

*Whereas,* The Florida Railroad and Public Utilities Commission has jurisdiction over the intrastate operations of railroads within the state of Florida, but not including railway labor disputes; and

*Whereas,* The laws of Florida authorize this commission to require any railroad company to properly operate its railroad, and to furnish all the necessary facilities for the convenience and prompt handling, transportation and delivery of all freight offered along its line for transportation; and

*Whereas,* The laws of this state require each railroad company to operate over every part of its line not less than one passenger and one freight train each way daily except Sunday, unless after hearing and investigation the commission shall determine that the public need does not require such daily service; and

*Whereas,* Said laws further provide that this commission shall have the right to require each railroad company to render greater service than the minimum daily service required by statute if the commission shall deem it to be to the best interest of the public; and

*Whereas,* The rules and regulations of this commission require that no railroad shall reduce either its freight or passenger service without first obtaining authority so to do from this commission; and

*Whereas,* This commission has never received any official request from the Florida East Coast Railway Company for authority to reduce or discontinue its passenger or freight service, or any part of either of such services, or to place any embargo on the acceptance of any freight for transportation by said railroad, in connection with its present general reduction in freight and passenger services; and

*Whereas,* This commission has not authorized the Florida East Coast Railway Company to reduce or discontinue any passenger or freight service in connection with the railroad's present general reduction in such services; and

*Whereas,* The laws of this state do not appear to recognize disputes and controversies between management and labor as a justifiable reason or legal grounds for reducing or discontinuing essential passenger and freight services to the public by a railroad company; and

*Whereas*, It has been the desire of this commission throughout the Florida East Coast Railway Company's pending controversy, however, to permit management and labor to settle their problems without any intervention or official coercion from this commission so long as there appeared to be some reasonable expectation of a speedy settlement; and

*Whereas*, It has also been the desire of this commission to refrain from doing anything that would in any manner interfere with any efforts that other government officials, who may have some jurisdiction in matters involving labor disputes, might be exerting to reconcile the conflicting interests in said controversy; and

*Whereas*, This commission has developed no convictions or opinions concerning the merits of management's position or the position of labor in this controversy; and

*Whereas*, This commission is of the opinion that the public's interest is of paramount importance in this matter and that the public is entitled to and should be afforded the passenger and freight services by the Florida East Coast Railway Company to which it is entitled under prevailing laws and the rules and regulations of this commission without further unreasonable delay; and

*Whereas*, It appears to this commission that the continued delay in the resumption of regular passenger and freight services by the Florida East Coast Railway Company is resulting in irreparable injury to the public.

Now, therefore, in consideration thereof, the Florida Railroad and Public Utilities Commission, on its own motion, does hereby institute a formal investigation of the reduction in regular freight and passenger services by the Florida East Coast Railway Company and, pursuant thereto, it is

Ordered by the Florida Railroad and Public Utilities Commission that the Florida East Coast Railway Company be and it is hereby directed and required to forthwith resume its regular freight and passenger services to the same extent as said services were offered to the shipping and traveling public prior to the effective date of the present reduction in operations, or file with this commission on or before Monday, April 15, 1963, its written response to this order and therein show cause, if any it can, why this commission should not take appropriate action, by punitive fine or otherwise, as a result of said railroad company's failure or refusal to resume operations as required herein. It is further

Ordered that said railroad company be and it is directed and required also to show cause at said time and in said manner, if any it can, why this commission should not take appropriate action, by punitive fine or otherwise, as a result of said railroad company's reduction in regular passenger and freight service without first obtaining authority from this commission to reduce or discontinue such services.

*Order calling for voluntary arbitration, July 31, 1963.* By Order no. 3555 entered herein on April 4, 1963, this commission required Florida East Coast Railway Company to resume normal freight and passenger operations or show cause by written response why appropriate punitive action should not be taken against said railroad by the commission.

In due course the respondent railroad submitted its written response, under oath, asserting that recent reductions in its freight and passenger services have been caused solely and entirely by the walkout of those of its employees who are members of eleven railway labor organizations, commonly referred to as the non-operating employees of the railroads. According to the response the cessation of work began on January 23, 1963, and it is alleged that the striking non-operating employees were joined on April 5, 1963, in a strike by the employees who are members of four operating unions.

The respondent railroad asserts that it cannot comply with any order of this commission requiring the resumption of full service as long as the strike continues; that neither this commission nor the railroad can force the striking employees to return to their jobs because their right to strike is sanctioned by the governing federal laws; and that the federal government has pre-empted and fully occupied the field of labor controversies between common carrier railroads operating in interstate and intrastate commerce in the United States and their employees.

The sworn response concludes with the assertion that the commission's concern for the public interest so adversely affected by the discontinuance of service is shared by the Florida East Coast, but this concern does not vest the commission with jurisdiction to enquire into and resolve a labor dispute under existing federal laws.

This commission recognizes, of course, that it has no jurisdiction over labor controversies. It is no secret that the federal government has fully and completely occupied this field and has left no room for an individual state to intervene and protect the public interest. We have no intention of attempting to exert a power where none exists. Nor has that been our purpose from the be-

ginning. We do seek, however, to underscore and emphasize the absolute necessity for the establishment of some means whereby the overriding interest of the general public can be protected in matters of this kind. This controversy has now been going on for six months and there have been reports of violence and property damage. This commission has received many complaints from local governmental agencies, shippers' organizations, chambers of commerce, and various civic groups, concerning the lack of adequate rail transportation service in the area served by the Florida East Coast Railway Company. No one can argue that this situation redounds to the public good and yet the public itself is completely frustrated in its efforts to obtain relief. In a situation of this kind it matters little to the general public who is to blame — its big concern is that it, the public, is paying a tremendous price and suffering irreparable injury. While the federal government has preempted this field and made it impossible for the state to act in the general public interest, there appears to be little or no activity on the part of federal agencies to solve the problem and reduce public inconvenience and actual losses brought about by inadequate transportation services and facilities. If the federal government is going to occupy this field then it ought to do so efficiently and effectively or else step aside and permit the state to exercise its police power in protecting the general public interest and welfare.

Some years ago the legislature of the state of Florida, in a solemn attempt to protect the public in situations of this kind, enacted what it termed the "Public Utility Arbitration Law." It prefaced this law with a declaration of policy which has never been repealed and which still stands as the declared public policy of the state, although rendered impotent by judicial decree. This appears to be a good time to refresh our memories as to what that policy was and is. The legislative declaration is in these words —

"That it is hereby declared to be the public policy of the State of Florida that it is necessary and essential in the public interest to facilitate the prompt, peaceful and just settlement of labor disputes between public utility employers and their employees which cause or threaten to cause an interruption in the supply of services necessary to the health, safety and well-being of the citizens of Florida, and to that end to encourage the making and maintaining of agreements concerning wages, hours and other conditions of employment through collective bargaining between public utility employers and their employees, and to provide settlement procedures for labor disputes between public utility employers and their employees in cases where the collective bargaining process has reached an impasse and stalemate, and as a result thereof the parties are unable to effect such settlement and which

labor disputes, if not settled, are likely to cause interruption of the supply of a public utility service on which the community so affected is so dependent that severe hardship would be inflicted on a substantial number of persons by a cessation of such service." (§453.01, Florida Statutes.)

The Florida Public Utility Arbitration Law applied to the business of rendering electric power, light, heat, gas, water, communication or transportation services to the public of this state. The law provided for the appointment of a board of arbitration in the event the parties were unable to effect a settlement. The decision of the board of arbitration, which could be rendered only after hearing, was subject to review by the circuit court and finally by the State Supreme Court.

We recognize, as did the Supreme Court of Florida, that the Florida Public Utility Arbitration Law is in conflict with the supreme law of the land because it substitutes *compulsory* arbitration for the right to strike which is guaranteed under federal law. Being in conflict with federal law the Florida statute is, of course, inoperative so long as that conflict persists. However, it is still carried in the Florida statutes even though the Supreme Court of Florida declared it inoperative ten years ago in the case of Henderson v State, 65 So.2d 22, and based upon it as representing the declared public policy of this state we *challenge* the Florida East Coast Railway Company and its employees who are presently engaged in this controversy of such long standing to *voluntarily* submit to the provisions of Florida's Public Utility Arbitration Law. We know of no law or court decision which would make it impossible for them to voluntarily submit to the provisions of this law which represents the public policy of this state. There appears to be little hope, so far as we have been able to ascertain, of the parties reaching any settlement of this controversy. Actually, there appears to be very little effort being made in that direction. To us it seems incredible that the public should have to suffer the loss of such an essential service simply because management and labor cannot reach a settlement of their difficulties. Both sides to this controversy appear to be concerned for the public interest. Is that concern sufficient to persuade them to voluntarily submit to the procedures established by the legislature for the settlement of labor disputes in businesses so affected with a public interest that they are regulated in almost every phase of their operations?

Based upon our recognition that we have no jurisdiction in labor controversies, and recognizing that the reduction of transportation services by the Florida East Coast Railway Company is the result of a labor controversy, we hereby dismiss this investigation with a *challenge* to management and labor to subor-

dinate their individual rights to the overriding interests and welfare of the general public and voluntarily submit their controversy to the orderly settlement procedures established by the Florida legislature when it enacted the Florida Public Utilities Arbitration Law.

As we dismiss this investigation we do so with the tender of our services to both parties for the purpose of assisting them in reaching a fair and reasonable settlement of their controversy so that the public will no longer suffer the deprivation of an essential transportation service.

Now, therefore, in consideration thereof, it is ordered by the Florida Public Utilities Commission that this investigation be and the same is hereby dismissed.